UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SERGIO LOVATI, RUDI LOVATI, ALESSANDRA
SARAGO LOVATI, AND ALESSANDRA LOVATI,

             Plaintiffs,

       -against-

PETRÓLEOS DE VENEZUELA, S.A.,

          Defendant.

Docket No.: 1:19-cv-04799-ALC

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PETRÓLEOS DE VENEZUELA, S.A.'S
MOTION TO DISMISS COMPLAINT OR, IN THE ALTERNATIVE,
<u>MOTION FOR STAY OF PROCEEDINGS</u>**

HOGAN LOVELLS US LLP
390 Madison Avenue
New York, New York 10017

*Attorneys for Defendant
Petróleos de Venezuela, S.A.*

Dated:  October 30, 2019

## TABLE OF CONTENTS

**Page(s)**

I.    THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(6) ................................................................................................................ 1

    A.    The Parties and the Indenture ............................................................................2

    B.    Argument ............................................................................................................4

           i.    Standard of review for a Rule 12(b)(6) Motion to Dismiss....................................................................................................4

           ii.    The Complaint must be dismissed because Plaintiffs are expressly prohibited from bringing suit for enforcement of the notes.......................................................6

           iii.    Even if Plaintiffs had the right to assert their claims, their demand for future interest payments must be dismissed..........................................................................................9

II.    IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED FOR 120 DAYS .... 9

    A.    Current Affairs in Venezuela .............................................................................11

           i.    Political Uncertainty in Venezuela ..........................................................11

           ii.    President Guaidó's Plan for Resolving Claims in an Orderly, Consolidated Manner in light of the Unprecedented Humanitarian Crisis in the Republic................................13

    B.    Argument ............................................................................................................14

III.    CONCLUSION........................................................................................................ 199

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................................5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................................5

*Cedarwoods CRE CDO II, Ltd. v. Galante Holdings, Inc.,*
    948 N.Y.S.2d 17 (N.Y. App. Div. 1st Dep't 2012) .................................................7

*Comparelli et al. v. República Bolivariana de Venezuela et al.,*
    No. 14-cv-24414, ECF No. 168 (S.D. Fla. May 9, 2019).......................................16

*DiFolco v. MSNBC Cable LLC,*
    622 F.3d 104 (2d Cir. 2010)....................................................................................5

*France v. Isbrandtsen-Moller Co.,*
    48 F. Supp. 631 (S.D.N.Y. 1943)..........................................................................14

*Friedman v. Chesapeake & Ohio Ry. Co.,*
    261 F. Supp. 728 (S.D.N.Y. 1966)..........................................................................6

*Galli v. Metz,*
    973 F.2d 145 (2d Cir. 1992)....................................................................................8

*Goldstein v. Childs Co.,*
    264 A.D. 793 (N.Y. App. Div. 2d Dep't 1942) ......................................................7

*Grant v. Erie,*
    542 Fed. Appx. 21 (2d Cir. 2013)...........................................................................5

*Helmerich & Payne Int'l Drilling Co. et al. v. Bolivarian Republic of Venezuela,*
    *Petróleos de Venezuela, S.A., and PDVSA Petróleos, S.A. et al.,*
    No. 11-cv-01735, ECF No. 133 (D.C. Cir. Feb. 15, 2019).....................................16

*Landis v. N. Am. Co.,*
    299 U.S. 248 (1936)................................................................................................14

*Lovati, et al. v. Petróleos de Venezuela, S.A.,*
    19-cv-04799, ECF No. 11 (S.D.N.Y. August 14, 2019)........................................17

*Mr. Olympia, LLC v. Ultimate Nutrition, Inc.,*
    No. 17 CV 1346 (ALC), 2018 WL 1322201 (S.D.N.Y. Mar. 13, 2018).................8

*Quadrant Structured Prods v. Vertin,*
    23 N.Y.3d 549 (2014). .........................................................................................6, 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Rojas v. Don King Prods., Inc.*,
    11 Civ. 8468, 2012 WL 760336 (S.D.N.Y. Mar. 6, 2012) .......................................................5

*Rosenfeld v. Hartford Fire Ins. Co.*,
    No. 88 Civ. 2153, 1988 WL 49065 (S.D.N.Y. May 12, 1998)...............................................16

*Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*,
    No. 18-7044, Doc. No. 1773506 (D.C. Feb. 14, 2019).........................................................16

*Victor v. Riklis*,
    No. 91 Civ. 2827, 1992 WL 122911 (S.D.N.Y. May 15, 1992)...............................................6

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................................................1, 4

**Other Authorities**

Exec. Order No. 13835, 83 Fed. Reg. 24,001 (May 24, 2018).....................................................18

*Executive Order on Blocking Property of the Government of Venezuela* (Aug. 5,
    2019), available at https://www.whitehouse.gov/presidential-
    actions/executive-order-blocking-property-government-venezuela/ .....................................18

*General License No. 5A, Authorizing Certain Transactions Related to Petroleos
    de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020* (Oct.
    24, 2019), available at https://www.treasury.gov/resource-
    center/sanctions/Programs/Documents/venezuela_gl5a.pdf.....................................................18

*General License No. 31 Certain Transactions Involving the Venezuelan National
    Assembly, the Interim President of Venezuela, and Certain Other Persons
    Authorized*, available at https://www.treasury.gov/resource-
    center/sanctions/Programs/Documents/venezuela_gl31.pdf ...................................................18

*Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public
    External Debt*, published by the Office of the Special Attorney General of the
    Bolivarian Republic of Venezuela, dated July 1, 2019, available at
    https://www.creditslips.org/files/wp-deuda-oper-eng.pdf .......................................................14

U.S. Dep't of Treasury, *OFAC FAQs: General Questions*, 9, available at
    https://www.treasury.gov/resource-
    center/faqs/Sanctions/Documents/faq_all.html. ...................................................................17

U.S. Dep't of Treasury, *OFAC, Other Sanctions Programs, Venezuela Sanctions*,
    FAQ No. 595, available at https://www.treasury.gov/resource-
    center/faqs/Sanctions/Pages/faq_other.aspx#595 ................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

U.S. Dep't of Treasury, *OFAC, Other Sanctions Programs, Venezuela Sanctions*,
   FAQ No. 596, available at https://www.treasury.gov/resource-
   center/faqs/Sanctions/Documents/faq_all.html ....................................................18

U.S. Dep't of Treasury, *Press Release: Treasury Sanctions Venezuela's State-
   Owned Oil Company Petróleos de Venezuela, S.A.* (Jan. 28, 2019), available
   at https://home.treasury.gov/news/press-releases/sm594. ......................................17

U.S. Department of State, Press Statement, Continuing U.S. Diplomatic Presence
   in Venezuela (Jan. 23, 2019), available at https://www.state.gov/continuing-u-
   s-diplomatic-presence-in-venezuela. ......................................................................11

The White House, *Statement from President Donald J. Trump Recognizing
   Venezuelan National Assembly President Juan Guaidó as the Interim
   President of Venezuela* (Jan. 23, 2019), available at
   https://www.whitehouse.gov/briefings-statements/statement-president-donald-
   j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-
   interim-president-venezuela/....................................................................................11

Defendant Petróleos de Venezuela, S.A. ("PDVSA") submits this memorandum of law in support of its motion to dismiss the complaint or, in the alternative, to stay proceedings (the "Motion") initiated by Plaintiffs Sergio Lovati, Rudi Lovati, Alessandra Sarago Lovati, and Alessandra Lovati (the "Plaintiffs," together with PDVSA, the "Parties").  PDVSA's Motion to Dismiss is based solely on Plaintiffs' Complaint and the documents upon which they relied and attached to their Complaint, which on their face preclude Plaintiffs from filing their present claims.  Should this Court deny the Motion to Dismiss, PDVSA requests a limited, 120-day stay of the proceedings because a short stay of proceedings is in the interests of justice because the Government of President Juan Guaidó is facing an unprecedented humanitarian crisis; has not yet fully transitioned to power; and does not yet have access to the relevant personnel with knowledge and information pertinent to this matter, which are necessary to defend against Plaintiffs' claims.  In filing this Motion, PDVSA reserves all rights and defenses that may be available to PDVSA and waives none.

## I.   THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(6)

In this action, Plaintiffs seek recovery for interest payments allegedly due under notes issued pursuant to an Indenture dated as of November 17, 2011, entered into by PDVSA in connection with the issuance of $2,394,239,600 of 9% notes due 2021 (the "Indenture").  The Indenture, however, indisputably bars Plaintiffs from bringing these claims.  Section 5.01(i) of the Indenture, commonly known as a "No Action Clause," states in relevant part that a "Holder shall not have any right to institute any suit, action or proceeding for the enforcement of this Indenture, or for the exercise of any other remedy hereunder" unless Holders of at least 25% in aggregate principal amount of the notes satisfy certain pre-suit conditions, including a demand

on the Trustee to bring suit on behalf of all noteholders.  None of those pre-suit conditions have been satisfied in this case.

Indeed, Plaintiffs *admit in the Complaint* each and every one of the facts on which this motion is based.  They admit that the Notes were issued pursuant to the Indenture (Compl. ¶ 1), and actually attach it to the Complaint (Compl Ex. A).   They admit that they hold approximately $55 million principal amount of the notes (Compl. ¶¶ 11-14)—far less than the 25% required to request the Trustee pursue a suit.  And they do not even attempt to allege that any of the pre-suit conditions for a Holder lawsuit have occurred.  Accordingly, under the plain and unambiguous terms of the Indenture, and the allegations of the Complaint, Plaintiffs' claims must be dismissed.

Even if Plaintiffs could bring suit, their claims would be defective.   Among other things, Plaintiffs have sued for all interest payments that "shall in the future become due."  Such future interest payments, however, are not currently due, and thus no claim can be brought – by any party – for a judgment on such amounts.  Although under certain circumstances future interest payments can be accelerated, and thus become due under the Indenture, no acceleration has been alleged in the Complaint, and none has occurred.  Thus, no claim may be brought to recover on amounts not yet due.

For these reasons, Plaintiffs' claims for breach of contract are barred and must therefore be dismissed.

### A.        The Parties and the Indenture

The Defendant in this case, PDVSA, is a state-owned oil and natural gas company that is 100% owned by the Bolivarian Republic of Venezuela (the "Republic").    Plaintiffs bring this suit against PDVSA for alleged failure to make certain interest payments under notes held by Plaintiffs and issued by PDVSA pursuant to the Indenture.  The notes provide for payment of 9%

interest per annum payable semi-annually in arrears on each May 17 and November 17, commencing May 17, 2012, until the principal is paid.  Compl., Ex. A, § 2.08(b).  The principal is due in three installments:  November 17, 2019, November 17, 2020, and November 17, 2021. The Indenture defines November 17, 2021, as the Maturity Date.  Compl., Ex. A., § 1.01.

The aggregate principal amount of the notes issued under the Indenture on the date of the original issuance of the notes was $2,394,239,600.00.  Compl., Ex. A, § 2.01(b).  Together, Plaintiffs identify themselves as "owners" of notes whose principal amounts to $55,455,000.00, collectively, or approximately 9% of the total of the original principal amount of the outstanding notes.  Compl., ¶¶ 11(a), 12(a), 13(a), 14(a).

To enforce its terms, the Indenture provides the following specific "No Action" clause, prohibiting suits by individual Holders as plaintiffs, unless specifically enumerated conditions are met:

> A Holder shall not have any right to institute a suit, action or proceeding for the enforcement of this Indenture, or for the exercise of any other remedy hereunder unless:  (1) such Holder has previously given the Trustee notice than an Event of Default is continuing; (2) Holders of at least 25% in aggregate principal amount of the then Outstanding Notes voting as a single class have requested the Trustee to pursue the remedy; (3) such Holders have offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense; (4) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and (5) Holders of a majority in aggregate principal amount of the then Outstanding Notes voting as a single class have not given the Trustee a direction inconsistent with such request within such 60-day period . . . .

Compl., Ex. A, § 5.01(i) (the "No Action Clause").  The Indenture confirms that "[a]ny suit, action, or proceeding shall be instituted and maintained in the manner provided [in the Indenture] for the benefit of the Holders of all Outstanding Notes."  *Id.*

Moreover, the Notes themselves specifically incorporate all of the terms and conditions of the Indenture.  Specifically, as set forth in the form note attached to the Complaint, the Notes

provide that:  "Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as amended from time to time."  Compl. Ex. A at 80.  The form note further emphasizes that "Holders may not enforce the Indenture or the Notes except as provided in the Indenture."  Compl., Ex. A, at 82.

The Indenture also provides for acceleration of principal and interest in the Event of Default if the following conditions are met:

> The Holders of at least 25% in principal amount of Outstanding Notes may declare the principal of, and premium, if any, accrued interest, and Additional Amounts, if any, on all the Notes to be due and payable by notice in writing to the Issuer and the Trustee specifying the Event of Default and that it is a "notice of acceleration."

Compl., Ex. A, § 5.01(b).  There is only one exception to the No Action Clause.   Holders have the right to individually enforce payment of the principal and interest of the note on the "Maturity Date."  Section 5.01(j) of the Indenture provides:

> Notwithstanding any other provision in this Indenture, any Holder shall have the right which is absolute and unconditional, to receive payment of the principal of (and premium and Additional Amounts, if any) and interest, if any, on such Note on the Maturity Date of such Note . . . and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Compl., Ex. A, § 5.01(j).  But the Maturity Date under the Indenture is over two years from now—November 17, 2021.  Compl., Ex. A, § 1.01 ("'Maturity Date' shall mean November 17, 2021.").  Thus, this exception is plainly inapplicable here.

### B.    Argument

#### i.    Standard of review for a Rule 12(b)(6) Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) requires the court to determine whether the facts alleged in the Complaint are sufficient to show that the plaintiff has a claim for relief.  For this analysis, the court must "accept[ ] all factual allegations in the complaint as true and draw [ ]

4

all reasonable inferences in the plaintiff's favor." *Grant v. Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013).  To survive a motion to dismiss, the plaintiff must have pled sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court evaluates the sufficiency of the complaint under the "two-pronged approach" set forth by the Supreme Court in *Ashcroft v. Iqbal*:  first, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth"; second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  556 U.S. 662, 678–79 (2009).

When deciding a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). A court may also consider a document that is not incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.*

To state a breach of contract claim under New York law, a plaintiff must allege:  (1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach.  Where a contract contains an unambiguous condition precedent, plaintiff must plead compliance therewith to state a breach of contract claim; otherwise, the claim should be dismissed.  *See, e.g., Rojas v. Don King Prods., Inc.*, 11 Civ. 8468, 2012 WL 760336, at *2-3 (S.D.N.Y. Mar. 6, 2012).

ii.     **The Complaint must be dismissed because Plaintiffs are expressly prohibited from bringing suit for enforcement of the notes.**

It is well established under New York law, which governs here, that a No Action clause bars claims by an individual bondholder who fails to comply with the conditions precedent recited in the debenture.  *See, e.g., Victor v. Riklis*, No. 91 Civ. 2827, 1992 WL 122911 (S.D.N.Y. May 15, 1992) (dismissing plaintiff's claim because "the 'no action' clause of the indentures relied on in the complaint prohibits an individual debenture holder such as [the plaintiff] from pursuing 'any remedy with respect to the Indenture or the Securities'"); *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728, 731 (S.D.N.Y. 1966) (finding that plaintiff's complaint failed to state a claim upon which relief can be granted where its complaint "does not allege that the conditions precedent to the suit, required by the trust indenture, have been met.").

New York courts strictly interpret No Action clauses "giv[ing] effect to the precise words and language used."  *Quadrant Structured Prods v. Vertin*, 23 N.Y.3d 549, 560 (2014).  Here, the No Action Clause is clear:  "[a] Holder *shall not have a right to institute any suit, action or proceeding for the enforcement of this Indenture*."  Compl., Ex. A, § 5.01(i) (italics added).  The instant breach of contract claims concerning alleged interest owed under the Indenture specifically seek "enforcement" of the Indenture.

Here, the allegations of Plaintiffs' own Complaint, and the documents attached to the Complaint, demonstrate that Plaintiffs are prohibited from bringing suit to enforce the Notes. Plaintiffs allege that they are individual shareholders who own less than 25% of the principal amount of the Notes (Compl., ¶¶ 11(a), 12(a), 13(a), 14(a)), and that the Maturity Date is more than two years away (Compl., Ex. A, § 1.01).

Plaintiffs do not even attempt to allege that the conditions precedent to suit by 25% of the noteholders have occurred.   The courts routinely dismiss noteholder suits when plaintiffs fail to plead compliance with the required conditions.  *See Goldstein v. Childs Co.*, 264 A.D. 793, 793 (N.Y. App. Div. 2d Dep't 1942) ("Since it would, therefore, be necessary for the plaintiff to invoke the aid of certain provisions of the trust indenture to validate his cause of action, he must plead and prove compliance with the requirements defined in that instrument as conditions precedent to the maintenance of the action by him as an individual holder of debentures."); *Cedarwoods CRE CDO II, Ltd. v. Galante Holdings, Inc.*, 948 N.Y.S.2d 17, 18 (N.Y. App. Div. 1st Dep't 2012) (affirming lower court's finding that plaintiffs failed to demonstrate likelihood of success on merits when "plaintiffs failed to comply with the . . . 'no-action' clause" where plaintiffs only held "an interest in . . . far less than the required 25%").   Thus, Plaintiffs' own pleadings establish that they have no right under the Indenture to bring this action.

Plaintiffs have asserted in pre-motion correspondence that the No Action Clause does not apply here because their suit seeks enforcement of the Notes, rather than the Indenture.  This argument is frivolous.  The form Notes (annexed as exhibits to the Indenture) attached to the Complaint expressly provides that the terms of the Indenture are incorporated into the Notes.  Paragraph 6 states expressly that "Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as amended from time to time."  Compl. Ex. A, at p. 80.  Paragraph 13 states:  "Holders may not enforce the Indenture or the Notes except as provided in the Indenture."  Compl. Ex. A at p. 82, ¶ 13.

Thus, Plaintiffs attempt to avoid the terms of the Indenture by claiming that their case is based on the Notes is nonsensical.  The Notes incorporate the terms of the Indenture, and thus any claim on the Notes is, by necessity, also based on, and limited by, the terms of the Indenture.

Furthermore, to interpret the No Action Clause to not apply to claims for non-payment under the Notes, as Plaintiffs argue, would render Section 5.01(j) of the Indenture a nullity.  If Plaintiffs were right, then the limitations in the Indenture would not apply to any Holder, and would permit any Holder to bring suit at any time, making the No Action clause meaningless. "New York law strongly encourages an interpretation of a contract that 'gives reasonable and effective meaning to all terms of a contract' and does not render 'at least one clause superfluous or meaningless.'"  *Mr. Olympia, LLC v. Ultimate Nutrition, Inc.*, No. 17 CV 1346 (ALC), 2018 WL 1322201, at *3 (S.D.N.Y. Mar. 13, 2018) (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (internal citations omitted)).

Plaintiffs' reliance on *Quadrant Structured Products Co., Ltd. v. Vertin*, cited by Plaintiffs in response to PDVSA's request for a pre-motion conference, is misplaced.  In that case, the Court held that the no-action clause in a trust indenture agreement governing the issuance of certain securities only precluded contractual claims arising under the indenture and did not bar claims for breaches of fiduciary duty, fraudulent transfer, and conspiracy.  *See Quadrant*, 23 N.Y.3d at 559, 564 ("[The] no-action clause applies only to contract claims under the indenture, not to Quadrant's common-law and statutory claims.").

Here, unlike the plaintiff in *Quadrant*, Plaintiffs do not assert common law and statutory claims.  They *only* assert claims for breach of contract, and those claims clearly arise from the Indenture, even if characterized as claims alleging breaches of the notes.  Indeed, Plaintiffs' Complaint explicitly states that "[f]or their relief, Plaintiffs seek payment of the accrued and unpaid interest on the Notes held by the Plaintiffs, *as provided for in the Indenture*, under the Notes and under New York law."  Compl. ¶ 1 (emphasis added).  And Plaintiffs expressly rely on the Indenture as the basis for this Court's jurisdiction over this action, alleging that "PSVSA

consented in the Indenture to submit to the jurisdiction of this Court, in respect to actions by holders of Notes issued under the Indenture, arising out of or based on such Notes, or arising out of or based on the Indenture itself." *Id.* at ¶ 8. Accordingly, Plaintiffs' failure to plead compliance with the conditions precedent outlined in the No Action Clause is fatal to their claims against PDVSA.

For all of these reasons, the Complaint must be dismissed.

> ### iii.    Even if Plaintiffs had the right to assert their claims, their demand for future interest payments must be dismissed.

In their Complaint, in addition to interest allegedly past due under the notes, Plaintiffs also seek damages for principal and interest "that shall in the future become due and remain unpaid by PDVSA." Compl., ¶¶ 20, 26, 32, 38. The claims for amounts "that shall in the future become due" fail to state a cause of action under the Indenture, and must be dismissed.

Under the Indenture, amounts that may be due in the future under the notes may be accelerated if the Holders of at least 25% in principal amount of Outstanding Notes notify the Trustee of their "notice of acceleration" due to a specific Event of Default, as defined in the Indenture. Compl., Ex. A, § 5.01(b). No acceleration has been alleged here.

Absent acceleration of the amounts due in the future under the notes, such amounts are not due and payable. Accordingly, Plaintiffs' claims for payment of such amounts fail to state a cause of action and must be dismissed.

## II.    IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED FOR 120 DAYS

Should this Court deny PDVSA's Motion to Dismiss the Complaint, PDVSA respectfully requests the Court stay all proceedings in this action for 120 days in light of the current events taking place in the Republic of Venezuela. This limited stay would not prejudice Plaintiffs and denying the stay would significantly prejudice PDVSA, as described below.

A limited 120-day stay of these proceedings is necessary as the government of the Republic is transitioning from the Nicolas Maduro regime, which is no longer recognized by the United States, to that of President Juan Guaidó.  The United States has recognized President Guaidó's government as the only legitimate government of the Republic. PDVSA is an instrumentality of the Republic.

Despite its legitimacy, President Guaidó's administration currently does not have access to the administrative functions that would allow it to fully exercise its authority.  The now defunct Maduro regime has prevented the Guaidó government from accessing relevant personnel with knowledge and information pertinent to this matter, which are necessary to defend against Plaintiffs' claims.

Moreover, President Guaidó's government is actively endeavoring to resolve the political and humanitarian challenges posed by the efforts of the Maduro regime.  In connection with these endeavors, President Guaidó is also coordinating an orderly resolution of the claims raised against the Republic, its agencies, and its instrumentalities in various courts and jurisdictions currently pending in the United States, including those raised by Plaintiff.  This Court should afford the Guaidó government the opportunity to bring about this orderly resolution during this transitionary period for the Republic.  Without such a stay, these organized efforts for efficient and comprehensive resolutions would be hindered and the Republic, its agencies, and instrumentalities, including PDVSA, would be unable to adequately defend themselves resulting in significant due process concerns and undue prejudice.

Further, Plaintiffs would not be prejudiced by the limited stay because, among other reasons, the United State Treasury Department's Office of Foreign Asset Control ("OFAC") has implemented regulations that block attachment and enforcement against PDVSA's assets and

would result in sweeping primary and secondary OFAC sanctions against US and non-US persons and legal entities, including Plaintiffs, that seek to execute against the assets of PDVSA. For these reasons, Plaintiffs cannot execute on PDVSA's assets without a specific license from OFAC, a license it presently does not have and is unlikely to obtain.

### A.    Current Affairs in Venezuela

### i.    Political Uncertainty in Venezuela

As of January 10, 2019, President Guaidó of the Venezuelan National Assembly has served as President of the Republic, pursuant to Article 233 of the Venezuelan Constitution.  On January 23, 2019, the same day President Guaidó ratified the application of Article 233, United States President Donald J. Trump formally recognized President Guaidó as the Interim President of Venezuela and rejected the legitimacy of the Maduro regime.[1]  In furtherance of this recognition, Secretary of State Pompeo confirmed that the "United States does not recognize the Maduro regime as the government of Venezuela," explaining that the "United States maintains diplomatic relations with Venezuela and will conduct our relations with Venezuela through the government of interim President Guaidó."[2]  Along with the Organization of American States and the Inter-American Development Bank, over 50 countries have recognized President Guaidó's government as the official government of the Republic.

To facilitate the transition to the Guaidó government, the National Assembly ratified the "Statue Governing the Transition to Democracy to Restore the Validity of the Constitution of the Bolivarian Republic of Venezuela" (the "Transition Statute").  Pursuant to Article 15.b of the

---

[1]    The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela* (Jan. 23, 2019), available at https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/.

[2]    U.S. Department of State, Press Statement, Continuing U.S. Diplomatic Presence in Venezuela (Jan. 23, 2019), available at https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela.

Transition Statute, the Special Attorney General designated by Interim President Guaidó has the power to appoint counsel of the state-owned entities, including PDVSA, in international litigation.  Through this authority, on February 5, 2019, President Guaidó appointed José Ignacio Hernández as Special Attorney General of Venezuela.   On March 19, 2019, the National Assembly approved the resolution that ratified Dr. Hernández as the only Special Authority with the power to represent the state-owned entities and appoint legal counsel in cases outside of Venezuela.  With that power, Dr. Hernandez has appointed the undersigned to appear on behalf of PDVSA and present this motion to stay.

Notwithstanding the U.S.'s and international community's recognition of the Guaidó government's sole authority to act on behalf of the Republic, President Guaidó's administration does not have full access to the personnel and documents of the government and its instrumentalities in the Republic at this time.  The Maduro regime has unlawfully maintained substantial control of the operation of the Venezuelan government, refusing to recognize the constitutional authority of the National Assembly and President Guaidó.   Among other institutions, the Maduro regime still controls the Venezuelan Central Bank, the Finance Ministry, and the Supreme Court, and the operations and assets of key government owned-entities within the Republic.  This means that the Guaidó government does not have full access or control over certain significant Republic operations, institutions, and personnel, including access to the bank accounts or assets of the Republic.

Nevertheless, President Guaidó has endeavored to take measures that are within his control to protect the interests of the Republic's people and to address legacy claims against the Republic, its agencies, and its instrumentalities, including PDVSA.  For example, President Guaidó is seeking to protect and preserve the assets related to the Republic's oil production and

sales, which represent the Republic's largest source of revenue and the source of virtually all of its foreign currency.

> ii.     **President Guaidó's Plan for Resolving Claims in an Orderly, Consolidated Manner in light of the Unprecedented Humanitarian Crisis in the Republic**

While the Republic is transitioning to the new Guaidó administration, the humanitarian crisis of the Republic remains. The millions of citizens are fleeing the country, almost 90 percent of Venezuelans live in poverty, and the minimum wage is less than $6.00 a month. These and other problems have created a massive humanitarian crisis that has significantly impacted the gross domestic product of Venezuela, which has fallen by more than 50 percent.

Almost all of the Republic's debt was incurred at a time when abundant production from Venezuela's vast oil and gas reserves provided the nation with currency to import food, medicine, and other products and to repay debt incurred in the ordinary course. During the Chavez and Maduro regimes, however, expropriations, corruption, and kleptocracy destroyed the oil and gas infrastructure and domestic production capacity that supported the country. As a result, the Republic is unable to meet its own needs through local production. Together with the looting of public resources that has occurred under the Maduro regime, the collapse of the oil industry has left the Republic without means to pay for essential, life-preserving imports like food and medicine; total imports have collapsed by almost 70 percent and continues to decline each day.

To address this humanitarian crisis, the Guaidó administration has prioritized a policy to seek a fair settlement of all legacy claims against the Republic, including claims arising from the prior government's indentures. To that end, the Republic plans to engage in an orderly, consensual debt restructuring in which all similarly situated commercial claims will be treated equally. To coordinate this effort, President Guaidó recently retained Mr. Lee Buchheit, a

qualified debt restructuring lawyer, on a *pro bono* basis to help restructure claims against the Republic dating from the Chavez/Maduro period.

The claims restructuring plan on which Mr. Buchheit has been assisting will address all of the external debt of, and claims against, the Republic.  This plan is being prepared in conjunction with the Guaidó administration's discussions with the United States government, which has expressed interest in assisting the Guaidó administration in addressing these issues.[3] To complete the plan and resolve all claims, the Guaidó administration and the National Assembly need time to address claims against the Republic, its agencies, and its instrumentalities, including PDVSA.

### B.    Argument

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes of its own docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  The Supreme Court has explained that stays are especially appropriate in times of "extraordinary public moment" when a litigant may be required to wait for a reasonable period of time "if the public welfare or convenience will thereby be promoted."  *Landis*, 299 U.S. at 256.  In furtherance of this position, the Courts have stayed litigation against foreign states during periods of political uncertainty or when other foreign relations concerns call for caution. *See France v. Isbrandtsen-Moller Co.*, 48 F. Supp. 631, 633-34 (S.D.N.Y. 1943) (staying all proceedings until 60 days after the French government was again recognized by the United States).  While the burden of justifying the motion to stay due to hardship or inequity falls on the moving party, PDVSA clearly satisfies that burden because a stay of all proceedings in this action is appropriate in light

---

[3]    *Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public External Debt*, published by the Office of the Special Attorney General of the Bolivarian Republic of Venezuela, dated July 1, 2019, available at https://www.creditslips.org/files/wp-deuda-oper-eng.pdf.

of the hardship and prejudice PDVSA would face if forced to proceed with this litigation at this time.

A limited stay is necessary in this case to afford President Guaidó's administration a reasonable opportunity to effectuate an orderly transition to democracy, address the significant humanitarian crises in Republic, and carry out a comprehensive public debt restructuring plan. As noted in Section I.B. of this Motion, the Guaidó government is working diligently to achieve these goals. Although President Guaidó's government is the legitimate government, as an instrumentality of the Republic, PDVSA presently does not have complete access to the documents and personnel of the government. As a result, PDVSA cannot fully or adequately defend itself or respond to Plaintiffs' claims in this action.

Given this circumstance, a limited stay of all proceedings against Venezuela and its instrumentalities, like PDVSA, is necessary until the government has completed its transition, which would allow PDVSA to evaluate the claims with access to personnel and information necessary to determine the adequate response to Plaintiffs' claim.

Courts in this district have granted limited or indefinite stays in cases involving Venezuela, its agencies, or its instrumentalities, including PDVSA. On May 6, 2019, the Court found that a stay was appropriate in another case involving PDVSA:

> Given the current political environment in Venezuela, the Court credits Defendants assertion that they "are not in a position to provide their counsel sufficient information to respond to the allegations . . . in this action, or obtain the necessary documents and testimony required to defend the merits of the case." The judicial interest in favor of resolving cases on their merits also weighs in favor of granting a stay.

Red Tree Investments, LLC v. Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A., No. 19-cv-2519, ECF. No. 33 (S.D.N.Y. May 6, 2019). See also White Beech SNC, LLC v. Petróleos

de Venezuela, S.A. and PDVSA Petróleo, S.A., No. 18-cv-4148, ECF No. 33 (S.D.N.Y. Feb. 6, 2019) (staying proceedings while plaintiff seeks OFAC guidance).

Other courts have similarly granted limited or indefinite stays in cases involving Venezuela and its agencies or instrumentalities on the basis of the current political uncertainty. *See, e.g.*, *Comparelli et al. v. República Bolivariana de Venezuela et al.*, No. 14-cv-24414, ECF No. 168 (S.D. Fla. May 9, 2019) (granting defendants' motion to stay due to current events in the Republic and ordering that "all judicial proceedings in this matter are STAYED until further notice of the Court"); *Helmerich & Payne Int'l Drilling Co. et al. v. Bolivarian Republic of Venezuela, Petróleos de Venezuela, S.A., and PDVSA Petróleos, S.A. et al.*, No. 11-cv-01735, ECF No. 133 (D.C. Cir. Feb. 15, 2019) (granting plaintiff's motion for an indefinite stay all proceedings); *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 18-7044, Doc. No. 1773506 (D.C. Feb. 14, 2019) (granting motion by defendant for 120-day stay of proceedings). This Court should do the same.

A limited stay in this case would cause Plaintiffs no undue prejudice; by contrast, PDVSA would be significantly prejudiced should the 120-day stay not be granted.  While the requested stay may result in an initial, short delay of the matter, the granting of the stay would likely avoid even greater delays.  If PDVSA is forced to respond to the allegations before having access to relevant information and personnel of PDVSA with knowledge of Plaintiffs' claims, PDVSA will be required to seek discovery from Plaintiffs and the Maduro regime, which even if possible, would require significant time to obtain.  *See Rosenfeld v. Hartford Fire Ins. Co.*, No. 88 Civ. 2153, 1988 WL 49065, at *2 (S.D.N.Y. May 12, 1998) (staying a case pending a multidistrict litigation decision because, while plaintiffs "may suffer some initial delay, once the

cases are coordinated and the defendants are able to response to all complaints in a coordinated manner, more time may well be saved than was lost.").

Aside from the limited delay of 120 days, Plaintiffs would not be prejudiced by the stay. Contrary to Plaintiff's position in a letter to this Court, there is no "race for PDVSA assets here in the Unites States" because, among other reasons, PDVSA's assets are blocked by U.S. sanctions.  *See Lovati, et al. v. Petróleos de Venezuela, S.A.*, 19-cv-04799, ECF No. 11 (S.D.N.Y. August 14, 2019).  Earlier this year, OFAC designated the Maduro-controlled PDVSA as a Specially Designated National ("SDN"), causing "all property and interests in property of PDVSA" to be subject to U.S. sanctions.[4]  Through this designation, the United States intended to "support Interim President Juan Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy" and to "preserve these [PDVSA] assets for the people of Venezuela."[5]  Therefore, granting a stay of the proceedings at this time would be consistent with the United States' policy to preserve the assets of the Republic.

In light of the increasingly severe OFAC sanctions targeted at the Maduro regime, Plaintiffs would not be prejudiced because the blocking of PDVSA's assets "immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property."[6]  On August 5, 2019, this prohibition was strengthened when President Trump

---

[4]      U.S. Dep't of Treasury, *Press Release: Treasury Sanctions Venezuela's State-Owned Oil Company Petróleos de Venezuela, S.A.* (Jan. 28, 2019), available at https://home.treasury.gov/news/press-releases/sm594.

[5]      U.S. Dep't of Treasury, *Press Release: Treasury Sanctions Venezuela's State-Owned Oil Company Petróleos de Venezuela, S.A.* (Jan. 28, 2019), available at https://home.treasury.gov/news/press-releases/sm594 (quoting Treasury Secretary Steven T. Mnuchin).

[6]      U.S. Dep't of Treasury, *OFAC FAQs: General Questions*, 9, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Documents/faq_all.html.

issued an executive order blocking all U.S. property of the Maduro regime.[7]   On October 24, 2019, the Trump administration shored up this protection by issuing General License 5A, which supersedes General License 5, ensuring that transactions related to the sale or transfer of CITGO shares in connection with PDVSA bonds are prohibited, unless specifically authorized by OFAC, until January 22, 2020.[8]   Therefore, Plaintiffs' argument that other creditors will be foreclosing on PDVSA's key U.S. assets has been conclusively addressed.   PDVSA's assets, which are presently controlled by the illegitimate government, cannot be attached or executed upon at this time without a license from OFAC.[9]   Because PDVSA is designated as an SDN, United States and non-United States persons and legal entities, including Plaintiffs, may face sweeping primary and secondary OFAC sanctions, respectively, should they seek to execute against the assets of the Republic, its agencies, its instrumentalities, and any entities owned or control by the Republic, including PDVSA.

---

[7]      *See Executive Order on Blocking Property of the Government of Venezuela* (Aug. 5, 2019), available at https://www.whitehouse.gov/presidential-actions/executive-order-blocking-property-government-venezuela/; *see also General License No. 31 Certain Transactions Involving the Venezuelan National Assembly, the Interim President of Venezuela, and Certain Other Persons Authorized*, available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl31.pdf (authorizing the Guaidó administration to engage in all transactions prohibited by the August 5, 2019 Executive Order).

[8]      *See General License No. 5A, Authorizing Certain Transactions Related to Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020* (Oct. 24, 2019), available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5a.pdf; *see also* U.S. Dep't of Treasury, *OFAC, Other Sanctions Programs, Venezuela Sanctions*, FAQ No. 595, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#595.

[9]      Other U.S. sanctions against the Maduro regime similarly confirm that any securities owned, directly or indirectly, by the Venezuelan Government, including those assets of PDVSA, cannot be attached or executed upon absent an OFAC license.  *See* Exec. Order No. 13835, 83 Fed. Reg. 24,001 (May 24, 2018); U.S. Dep't of Treasury, *OFAC, Other Sanctions Programs, Venezuela Sanctions*, FAQ No. 596, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Documents/faq_all.html.

## III.   CONCLUSION

For the foregoing reasons, Defendant Petróleos de Venezuela, S.A. respectfully requests that this Court dismiss the Complaint with prejudice for failure to state a claim and for any other relief that the Court shall deem appropriate, or, in the alternative, that this Court grant Defendant Petróleos de Venezuela, S.A.'s motion for stay of proceedings and enter an order staying all proceedings in this action for 120 days.

Dated:  October 30, 2019                                 Respectfully submitted,

New York, New York

**HOGAN LOVELLS US LLP**

By:

Dennis H. Tracey, III
390 Madison Avenue
New York, New York 10017
Phone: 212-918-3000
Fax:    212-918-3100
dennis.tracey@hoganlovells.com

*Counsel for Defendant Petróleos de Venezuela, S.A.*

19