UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SERGIO LOVATI, RUDI LOVATI, ALESSANDRA SARAGO LOVATI, AND ALESSANDRA LOVATI,

          Plaintiffs,

    -against-

PETRÓLEOS DE VENEZUELA, S.A.,

          Defendant.

Docket No.: 1:19-cv-04799-ALC

**DECLARATION OF JOSÉ IGNACIO HERNÁNDEZ GONZÁLEZ
IN SUPPORT OF DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS COMPLAINT OR, IN THE ALTERNATIVE,
<u>MOTION FOR STAY OF PROCEEDINGS</u>**

      **José Ignacio Hernández González** submits this declaration under penalty of perjury, which may include fine or imprisonment:

    1.      I am the Special Attorney General of the Republic of Venezuela and I submit this declaration in support of the reply of Defendant Petróleos de Venezuela, S.A. ("PDVSA") in support of its motion to dismiss the complaint or, in the alternative, for a stay of proceedings.

    **I.**    **Background**

    2.      I received my law degree from the Andrés Bello Catholic University in Caracas, Venezuela, and subsequently received a Ph.D. in Administrative Law from the Universidad Complutense de Madrid.  In addition to practicing law, I am a professor of Administrative Law at Andrés Bello Catholic University and the Central University of Venezuela.  I am also a visiting professor at the Castilla-La Mancha University in Spain.  Currently, I am a Visiting Fellow of the Center for International Development at Harvard University.

3. Since February 5, 2019, I have been the Special Attorney General of the Republic of Venezuela (the "Republic" or "Venezuela"), appointed by Juan Guaidó, the President of the Venezuelan National Assembly and the Interim President of the Republic.

4. Pursuant to article 233 of the Venezuelan Constitution, beginning on January 10, 2019, the position of Presidency of Venezuela has been held by the President of the Venezuelan National Assembly, Deputy Juan Guaidó. On January 23, 2019, Guaidó ratified the application of article 233, acting as Interim President of Venezuela. That same day, United States President Donald Trump issued a statement officially recognizing President Guaidó as the Interim President of Venezuela and rejecting the legitimacy of the Nicolás Maduro government.[1] Since that time over 55 countries have recognized the Guaidó government as the official government of Venezuela, as have the Organization of American States and the Inter-American Development Bank.

5. To facilitate the transition to the newly-installed Guaidó government, the National Assembly enacted the "Statute Governing the Transition to Democracy to Restore the Validity of the Constitution of the Bolivarian Republic of Venezuela" (the "Transition Statute"). Pursuant to Article 15.b of the Transition Statute, the Special Attorney General designated by Interim President Guaidó has the power to appoint counsel of state-owned entities of Venezuela in international litigation. On February 5, 2019, pursuant to the authority granted in Article 15.b of the Transition Statute, President Guaidó appointed me as the Special Attorney General of Venezuela. A true and correct copy of the "Designación de José Ignacio Hernandez," dated February 5, 2019, is annexed as **Exhibit 1**.

---

[1] *See* Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela (Jan. 23, 2019), available at https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela.

6. On March 19, 2019, the National Assembly approved a resolution that ratified the usurpation of Mr. Reinaldo Muñoz Pedroza as Attorney General of the Republic (as Maduro's illegally appointed Attorney General) and ratified me as the only Special Attorney General that has the power to represent the Republic and state-owned entities, and appoint legal counsel. A true and correct copy of the "Acuerdo de Ratificación de la Usurpación," dated March 19, 2019, is annexed as **Exhibit 2**. As a result, the U.S. judiciary has recognized Interim President Juan Guaidó as the sole, legitimate government in Venezuela.[2]

## II. The Maduro Regime's Usurpation of Control over the Government

7. Although the Guaidó government is the sole authority recognized by the United States, it does not have full access to the personnel and documents of the government and its instrumentalities, including PDVSA. To the contrary, although Venezuela is a collapsing state, the illegitimate Nicolás Maduro regime has maintained substantial control of the operation of the Venezuelan government. Thus far, Maduro has refused to recognize the Constitutional authority of the National Assembly and the Interim President Guaidó, and has instead unlawfully usurped the operations of government. Among other things, the Maduro regime illegitimately controls the Central Bank, the Supreme Court (where Maduro has unlawfully appointed judges loyal to the illegitimate regime), the Finance Ministry, and the Venezuelan operations and assets of the key government owned entities, including PDVSA.

---

[2] On May 1, 2019, in the appeal of the matter of *Rusoro Mining Limited, Gold Fields Limited v. Bolivarian Republic of Venezuela*, No. 18-7044, the United States Court of Appeals for the District of Columbia Circuit recognized the sole authority of the Special Attorney General to represent the Republic of Venezuela in litigation in the United States. Relying on this order, on May 21, 2019, the United States District Court for the District of Columbia "recognize[d] the Guaidó government lawyers as the appropriate representatives of Venezuela" in *OI European Group B.V. v. Bolivarian Republic of Venezuela*, No. 16-1533.

8. As a result, the Guaidó government does not have full access to the Republic's operations, facilities, or personnel. Specifically, the Guaidó government cannot access the documents or electronic records of PDVSA; cannot interview personnel with knowledge of the claims; and cannot even determine the identity of the government officials and personnel involved in the underlying negotiations of the Indenture, dated as of November 17, 2011, as amended (the "Indenture") and note at issue in this matter. Nor does the Guaidó government have access to the bank accounts or assets of the government in Venezuela.

### III. President Guaidó's Appointment of an Ad Hoc PDVSA Board

9. Although the illegitimate Maduro regime has barred President Guaidó from access to the vast majority of government operations and facilities, President Guaidó has taken significant steps within his control to protect the interests of the Venezuelan people. Because oil production and sales constitute the Republic's largest industry and the source of virtually all of its foreign currency, President Guaidó has taken steps within his power to protect and preserve those assets. These actions aim to reduce the collapse of the Venezuelan oil industry, which results from the Maduro regime's kleptocracy.

10. In addition to its operations in Venezuela, which are controlled by the illegitimate Maduro regime, PDVSA owns, through subsidiaries, certain assets and operations outside of Venezuela, including PDVSA's ownership, through its Delaware subsidiary PDV Holdings, Inc., of Citgo Petroleum Corporation, a refiner, transporter, and marketer of fuel. Citgo Petroleum Corporation is currently under the control of the legitimate ad-hoc board of directors of PDVSA, appointed by Interim President Guaidó.

11.  To that end, on February 12, 2019, President Guaidó and the National Assembly appointed an "ad hoc" board of directors of PDVSA, pursuant to the authority granted Transition Statute Articles 15.a and 34.  Thereafter, through Presidential Decree Number 3, dated April 10, 2019, the Interim President expanded the size and scope of the "ad-hoc" board's authority.  In this regard, the "ad-hoc" board, with the previous approval of the National Assembly, authorized the payment "under protest" of interest on PDVSA bonds secured by the shares of Citgo to preserve PDVSA assets for the Venezuelan people and more recently decided to file a law suit questioning the validity of the those bonds.[3]

12.  The fact that President Guaidó and the "ad hoc" board have been making efforts to preserve assets outside of Venezuela does not mean that they have total control within Venezuela, which is controlled by the illegitimate regime of Maduro.  Indeed, the Maduro-controlled Supreme Court has purported to strip President Guaidó and others members of the National Assembly of the immunity from prosecution that members of the National Assembly possess under Venezuelan law, exposing legitimate members of the National  Assembly to arrest and/or prosecution.

**IV.  President Guaidó Lacks Access to Facts Essential to Respond to the Complaint**

13.  As a result of the above-described unlawful acts of the Maduro regime, PDVSA is not in a position to provide counsel with sufficient information to respond to the Plaintiffs' allegations in this action, to provide access to records, or to obtain the necessary documents and testimony required to defend the merits of the case, or to even evaluate the contractual rights and remedies of the parties under the relevant agreements.

---

[3]  *See* Compl., Dkt. 1-1, *Petróleos de Venezuela, S.A., et al. v. MUFG Union Bank, N.A., et al.*, Case 1:19-cv-10023-KPF (S.D.N.Y. Oct. 29, 2019).

14. For example, the Guaidó government has no ability to confer with the individuals who were involved in the negotiation or execution of the Indenture and note upon which Plaintiffs' base their claims, or to speak with PDVSA employees or public officials in Venezuela who have direct knowledge of the facts and circumstances related to the alleged debt. Nor can the Guaidó government review the files relating to the Indenture and note, and any related payments, correspondence, or records.

15. The Guaidó government needs access to information and personnel to investigate facts at issue in this matter and PDVSA's possible defenses. Currently, PDVSA cannot present facts essential to justify PDVSA's opposition to the Plaintiffs' claims. Specifically, the Guaidó government should be afforded the opportunity to investigate (a) whether the notes are in fact held by the Plaintiffs, (b) the value of the alleged monies owed, if any, among other inquires, (c) whether the interest has been paid, and (d) whether there have been any negotiations, amendment, or modification concerning the relevant agreements, among other issues. This information may result in a genuine issue of material fact concerning the Plaintiffs' entitlement to any damages. Given Maduro's control over Venezuela's instrumentalities, the Guaidó administration has been unable to obtain information concerning these relevant and material facts. Without access to the files and personnel, we have no ability to evaluate whether the facts presented by the Plaintiffs are accurate or complete, and whether certain defenses may be available to PDVSA in this matter.

**V.     The Unparalleled Collapse of Venezuela and Claim Restructuring Process**

16.     Venezuela is collapsing amidst an unparalleled, complex humanitarian crisis.  As explained by Professor Ricardo Hausmann, the Venezuela Governor before the Inter-American Development Bank, the gross domestic product "*has fallen by well over 50 percent.  That is double the size of the U.S. Great Depression.  It's double the size of the Greek crisis.  It's double the size of the economic collapse that occurred during the Spanish Civil War.  It is something of really unique proportions.  The consequence of that collapse is expressed in the fact that the minimum wage today is $6 a month.  That means that the minimum wage does not buy two eggs a day. It buys something like 700 calories a day.  It means that because you don't have the calories and the proteins and the medicines for 30 million people, people are losing weight.  This has been measured at something like eight kilos a year on average — there is in that the stunting of children's growth.*"[4]  This collapse has trigged a massive migration crisis.  According to the General-Secretary of the Organization of American States, Mr. Luis Almagro, "*with more than 3.4 million, Venezuelans are the second largest refugee population in the world, second only to Syria, which has been at war for 7 years. And the forecasts indicate that by the end of 2019 the exodus will reach 5.4 million people*."[5]  The collapse of the failed Venezuelan State under the illegitimate Maduro regime caused this complex, humanitarian emergency in Venezuela.

17.     To address the humanitarian crisis, President Guaidó also must address the economic crisis in Venezuela.  To that end, President Guaidó has retained veteran debt restructuring lawyer, Mr. Lee Buchheit, on a pro bono basis, to help restructure claims against the Republic and the public sector dating from the Chavez/Maduro period.

---

[4]     *See* https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-make-sense-of-venezuelas-collapse/.

[5]     *See* https://www.oas.org/en/media_center/press_release.asp?sCodigo=E-009/19.

18.     On July 1, 2019, my office, the Office of the Special Attorney General, issued the "Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public External Debt," which details the preliminary plan for claims restructuring (the "Plan"). A copy of the Plan is attached as **Exhibit 3**. This Plan was drafted with the support and guidance of Mr. Buchheit to address the guidelines to be followed in renegotiating the private claims denominated in foreign currency against the Republic and the Venezuelan public sector. The Plan was prepared in conjunction with the Guaidó government's discussions with the U.S. government, which has expressed interest in assisting the Guaidó administration in addressing these important issues.

19.     The Plan delineates the claims that will be considered in the restructuring; the renegotiation will include all private claims of external debts denominated in foreign currency against Venezuela and its instrumentalities. To carry out the Plan, the Interim Government and the National Assembly propose the appointment of a debt reconciliation agent, who will have the responsibility of compiling a list and to inventory the inherited pending claims, along with determining the amount of each for the purpose of the renegotiation. Exhibit 3, Plan, ¶ 2. The calculation of the amount of each claim will include consideration of the principal outstanding amount plus the accrued interest in accordance with the original contractual terms. *Id.* Once the amount is determined, the claim will be addressed along with all other claims eligible to participate in the renegotiation process, on the same terms. In other words, the Plan confirms that no claim will be treated differently based on their origin, their nature, domicile of the claimant and/or the identity of the public sector debtor, regardless if the claim has been subject to a judicial decision or other similar mechanism. *Id.*, ¶ 3. The Guaidó administration will seek the assistance of multilateral entities to develop a long term plan for the economic recovery of the country and the payments required with respect to the renegotiated claims. *Id.*, ¶ 4.

20. While the guidelines to the Plan have been approved, the Guaidó administration and the National Assembly need time to approve and implement the Plan before addressing individual claims, including the Plaintiffs' claims asserted in this action. For example, they still need time to establish the policies to be followed by the debt reconciliation agent to carry out his/her duties.

21. Based on the unprecedented financial and humanitarian crisis in Venezuela, the Guaidó government should be given time to address its claims in a global manner that best serves the interests of the Venezuelan people.

**VI.  OFAC Sanctions Prohibit Claimants from Enforcing Judgements**

22. The United States Treasury Department's Office of Foreign Asset Control ("OFAC") implemented regulations that effectively prohibit the collection of a judgement against PDVSA. Earlier this year, OFAC designated the Maduro-controlled PDVSA as a Specially Designated National ("SDN"), such that "all property and interests in property of PDVSA" became subject to U.S. sanctions.[6]

23. The OFAC sanctions were recently extended to include the blocking of the sale or transfer of PDVSA's key U.S. assets, CITGO shares, in connection with PDVSA bonds until January 22, 2020.[7] OFAC's protection against any attachment or execution of PDVSA's assets

---

[6] U.S. Dep't of Treasury, *Press Release: Treasury Sanctions Venezuela's State-Owned Oil Company Petróleos de Venezuela, S.A.* (Jan. 28, 2019), available at https://home.treasury.gov/news/press-releases/sm594.

[7] *See General License No. 5A, Authorizing Certain Transactions Related to Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020* (Oct. 24, 2019), available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5a.pdf; *see also* U.S. Dep't of Treasury, *OFAC, Other Sanctions Programs, Venezuela Sanctions*, FAQ No. 595, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#595.

was also clarified on November 22, 2019, when OFAC added a new interpretive provision to the Venezuela Sanctions Regulations. That interpretive provision provides that "*the enforcement of any lien, judgement, arbitral award, decree, or other order through execution, garnishment or other judicial process purporting to transfer or otherwise alter or affect property blocked pursuant to § 591.201 is prohibit.*"[8] Because PDVSA's assets are blocked from being transferred, no judgment may be enforced against such assets unless the judgement creditor has a special license or the OFAC sanctions are lifted.

24. While Plaintiffs will not be prejudiced by a limited stay because they cannot enforce any judgement, if forced to litigate this case through to an unenforceable judgement, PDVSA will be prejudiced by the inability to adequately defend itself against the claims raised by the Plaintiffs.

### VII. Conclusion

25. For the foregoing reasons, PDVSA respectfully requests that the Court grant a stay of proceedings for 120 days, if not dismissed, to allow the Guaidó government to assume full control over the government and to give the Guaidó government the opportunity to make fully informed decisions that protect the interests of the Venezuelan people.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on the 26th day of November 2019.**

José Ignacio Hernández González

---

[8] Venezuela Sanctions Regulations, 31 CFR § 591.407 (Nov. 22, 2019).