UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RUDI LOVATI AND ALESSANDRA LOVATI, | : |
| Plaintiffs, | : |
| v. | :    Civil Case No. 19-cv-04799-ALC-HJR |
| PETRÓLEOS DE VENEZUELA, S.A., | : |
| Defendant. | : |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, New York 10017
(212) 692-1000

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

**PROPOSED FINDINGS OF FACT** ......................................................................... **1**

    I.      Plaintiffs Own Notes Issued by PDVSA. ............................................. 1

    II.     PDVSA's Default on Plaintiffs' Notes. ............................................... 4

    III.    PDVSA Continued to Make Post-"Impossibility" Payments on Other of its Bonds. ....................................................................................... 5

    IV.   The Creation of an Alternative Payment Route was Both Permissible and Possible. ................................................................................................ 8

**CONCLUSIONS OF LAW** ................................................................................... **11**

    V.     Plaintiffs Have Established a Prima Facie Case of PDVSA's Breach of the Notes ................................................................................................ 11

    VI.   PDVSA's Breach of the Notes Is Not Excused By the Impossibility Doctrine.... 12

          A.    Impossibility Doctrine Available Only for Executory Contracts. ............ 13

          B.    PDVSA Cannot Prove Its Note Payments Were Impossible. ................... 14

          C.    At Most, PDVSA Has Proven Only A Single Note Payment Was Impossible. .......................................................................................... 17

    VII.  PDVSA Must Make Plaintiffs Whole and Rescind the Notes to Invoke Impossibility. .................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338 (1968) ........................................................................................................................14

*Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504 (2d Cir. 1991) ...............................21

*Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33 (2d Cir. 2009) ................................12

*Bistro Shop LLC v. N.Y. Park N. Salem*, 175 A.D.3d 1181, 109 N.Y.S.3d 277 (1st Dep't 2019) ................................................................................................................... 20-21

*Brittain v. Trust of Columbia Univ. in the City of New York*, No. 20-CV-9194 (PKC), 2021 WL 3539664 (S.D.N.Y. Aug. 11, 2021) ..........................................................19

*Cameron-Hawn Realty Co. v. City of Albany*, 207 N.Y. 377, 101 N.E. 162 (1913) ....................15

*Clarex Ltd. v. Natixis Sec. Americas LLC*, 988 F. Supp. 2d 381 (S.D.N.Y. 2013) .......................14

*Dresser-Rand Co. v. Petroleós de Venezuela, S.A.*, 574 F. Supp. 3d 217 (S.D.N.Y. 2021), *aff'd sub nom. Siemens Energy, Inc. v. Petroleós de Venezuela, S.A.*, 82 F.4th 144 (2d Cir. 2023) ..................................................................................................................12

*Dvoskin v. Prinz*, 205 A.D.2d 661, 613 N.Y.S.2d 654 (2d Dep't 1994) ........................12

*EM Ltd. v. Republic of Argentina*, 382 F.3d 291 (2d Cir. 2004) ....................................12

*FDIC v. Malin*, 802 F.2d 12 (2d Cir. 1986)....................................................................13

*In re Food Mgmt. Grp., LLC*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007)............................18

*Health-Chem Corp. v. Baker*, 915 F.2d 805 (2d Cir. 1990) ..........................................15

*Int'l Paper Co. v. Rockefeller*, 161 A.D. 180, 146 N.Y.S. 371 (3d Dep't 1914) ...........................18

*Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384 (1987) ...................... 14-15

*Kinzer Const. Co. v. State*, 125 N.Y.S. 46 (Ct. Cl. 1910), *aff'd,* 145 A.D. 41, 129 N.Y.S. 567 (3d Dep't 1911), *aff'd,* 204 N.Y. 381 (1912)....................................................18

*Krulewitch v. Nat'l Importing & Trading Co.*, 195 A.D. 544, 186 N.Y.S. 838 (1921) ................15

*Leisure Time Travel, Inc. v. Villa Roma Resort & Conf. Ctr., Inc.*, 55 Misc. 3d 780, 52 N.Y.S.3d 621 (N.Y. Sup. Queens Cty. 2017) ........................................................20

*Miller v. Vanderlip*, 285 N.Y. 116, 33 N.E.2d 51 (1941) ..............................................18

*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y. 2017),
  *aff'd*, 719 F. App'x 47 (2d Cir. 2017) .......................................................................12

*Mohassel v. Fenwick*, 5 N.Y.3d 44, 799 N.Y.S.2d 758 (2005) ....................................21

*Moreno-Godoy v. Kartagener*, 7 F.4th 78 (2d Cir. 2021).............................................13

*Mun. Cap. Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379 (S.D.N.Y. 2002)...........12

*NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) ................................ 11-12

*Ogletree, Deakins, Nash, Smoak & Stewart P.C. v. Albany Steel Inc.*, 243 A.D.2d 877,
  663 N.Y.S.2d 313 (3d Dept. 1997) ...........................................................................21

*PDVSA. v. MUFG Union Bank, N.A.*, No. 19-cv-10023 (S.D.N.Y Sep. 16, 2020), ECF
  No. 213.....................................................................................................................5-6

*ReGen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484 (2d Cir.
  2008) .........................................................................................................................13

*Residential Fences Corp. v. Rhino Blades Inc.*, No. 14-CV-2552 (SIL), 2024 WL 964681
  (E.D.N.Y. Mar. 6, 2024), *aff'd*, No. 24-897-CV, 2025 WL 583323 (2d Cir. Feb. 24,
  2025) .........................................................................................................................21

*Santander Bank, N.A v. Am. Best Getaways Inc.*, No. 714168/18, 2019 WL 3531915
  (N.Y. Sup. Queens Cty. June 12, 2019)....................................................................14

*Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144 (2d Cir. 2023)....................15

*Sokoloff v. National City Bank of New York*, 208 A.D. 627, 204 N.Y.S. 69 (1st Dep't
  1924), *aff'd*, 239 N.Y. 158 (1924) .......................................................................13, 19

*United States v. General Douglas McArthur Senior Village, Inc.*, 508 F.2d 377 (2d Cir.
  1974) .........................................................................................................................19

*Univ. of Minnesota v. Agbo*, 176 Misc.2d 95, 673 N.Y.S.2d 812 (2d Dep't App. Term
  1998) .........................................................................................................................20

## Statutes

22 U.S.C. § 9702(c) ......................................................................................................2-3

28 U.S.C. § 1603...........................................................................................................1-2

N.Y. CPLR § 5001(a) ....................................................................................................20

## Other Authorities

Exec. Order No. 13808 ..........................................................................................5, 15-17

Fed. R. Civ. P. 12 ........................................................................................................22

Restatement of Contracts 463 ......................................................................................17

Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981)....................................14

Restatement (Second) of Contracts § 264 cmt. a, illus. 4 ............................................15

Pursuant to Section 4(B)(ii) of the Individual Practices of Judge Carter and the Court's Order dated August 29, 2025 (D.E. 176), Plaintiffs Rudi Lovati and Alessandra Lovati (collectively, "Plaintiffs") respectfully submit the following proposed findings of fact and conclusions of law. Plaintiffs reserve the right to supplement, amend, and/or revise these findings following the conclusion of the trial of this matter to incorporate the testimony and evidence developed therein.

## PROPOSED FINDINGS OF FACT

### I.    Plaintiffs Own Notes Issued by PDVSA.

1.    Defendant Petróleos de Venezuela, S.A. ("PDVSA") is the state-owned oil company of the Bolivarian Republic of Venezuela ("the Republic" or "Venezuela"). (D.E. 167-1 ["Stipulated Facts"] ¶ 1.) PDVSA is a capital stock corporation organized under the laws of the Republic, and majority owned by the Republic. (Stipulated Facts ¶¶ 2-3.) As such, PDVSA is an "Agency or Instrumentality of a Foreign State," as defined in 28 U.S.C. § 1603. (*Id.*)

2.    Citgo Petroleum Corporation ("Citgo") is a U.S.-based subsidiary of PDVSA. (*Id.* at ¶ 4.)

3.    Hugo Chávez was president of Venezuela from 1999 until his death in 2013. (*Id.* at ¶ 5.) Nicolás Maduro ("Maduro") succeeded Hugo Chávez as president of Venezuela in 2013. (*Id.* at ¶ 6.) Maduro won a subsequent presidential election in 2013 "amid allegations of pre- and post-election fraud, including government interference, the use of state resources by the ruling party, and voter manipulation," according to the U.S. State Department's Venezuela 2016 Human Rights Report. (*Id.* at ¶ 7.)

4.    In Venezuela's 2015 legislative elections, the opposition coalition won a super majority two-thirds control of the National Assembly, Venezuela's legislative body. (*Id.* at ¶ 9.)

5.    On May 20, 2018, Maduro was reelected in a snap presidential election. (*Id.* at ¶ 14.) On January 10, 2019, Maduro's second term as president began. (*Id.* at ¶ 17.)

6.    On January 23, 2019, the 2015 National Assembly invoked Article 233 of the Venezuelan Constitution to name the president of the 2015 National Assembly, Juan Guaidó ("Guaidó"), Interim President of Venezuela. (Stipulated Facts at ¶ 18.)

7.    The United States formally recognized Guaidó as Venezuela's interim president on January 23, 2019, and declared the 2015 National Assembly and its progeny "the only legitimate branch" of the Venezuelan government. (*Id.* at ¶¶ 19-20.) The United States continues to recognize the 2015 National Assembly as "the only legitimate national legislative body in Venezuela," according to 22 U.S.C. § 9702(c). (*Id.* at ¶ 20.)

8.    PDVSA's U.S. subsidiaries are managed by its "Ad Hoc Board" of directors, appointed by the interim president. (*Id.* at ¶ 21.) PDVSA is represented in U.S. courts through the Ad Hoc Board, appointed by the interim president. (*Id.* at ¶ 22.)

9.    On November 17, 2011, PDVSA entered into an Indenture, as amended ("Indenture"), pursuant to which it issued a series of notes ("Notes" or "2011 Notes" or "9% Notes"). (*Id.* at ¶ 25.) The aggregate principal amount of the Notes delivered under the Indenture on its issue date was $2,394,239,600. (*Id.* at ¶ 26.)

10.    Pursuant to the terms of the Indenture, PDVSA Petróleo S.A. operates as the guarantor; Wilmington Trust Company as the trustee; Citibank, N.A., as registrar, transfer agent, and principal paying agent; and Dexia Banque Internationale à Luxembourg, Société Anononyme, as Luxembourg listing agent and paying agent. (*Id.* at ¶ 25.)

11.    In 2016, Citibank, N.A. ("Citibank") resigned and Law Debenture Trust Company of New York ("Law Debenture") replaced Citibank as Registrar, Transfer Agent, and Principal

Paying Agent under the Indenture. (*Id.* at ¶¶ 35-37.) In December 2016, Delaware Trust Company ("Delaware Trust") acquired Law Debenture, and succeeded Law Debenture as Registrar, Transfer Agent, and Principal Paying Agent under the Indenture. (*Id.* at ¶ 37.)

12.     Section 2.08(b) of the Indenture provides that the Notes bear an interest rate of 9% *per annum*. (*Id.* at ¶ 27.)

13.     Section 2.08(b) and the definition of the Maturity Date of the Indenture further provides that the Notes matured on November 17, 2021. (Stipulated Facts ¶ 30.)

14.     Pursuant to Section 2.08(b) of the Indenture and its definition of "Maturity Date," the Notes obligated PDVSA to make three equal principal payments in installments on November 17, 2019, November 17, 2020 and November 17, 2021. (*Id.* at ¶¶ 29-30.)

15.     Section 2.08(b) of the Indenture further imposes semi-annual interest payment obligations upon PDVSA, with payments being due every May 17 and November 17 until the Notes' principal has been paid or fully provided for. (*Id.* at ¶ 31.)

16.     Section 2.08 of the Indenture does not require an exclusive form or method of transfer to effect payment of principal and interest under the Notes. (Pltfs. Tr. Ex. 8 at 5.) Indeed, Section 2.08 (dealing with payments of principal and interest) could be modified, and alternative methods of payments were frequently employed. (*See generally* Pltfs. Tr. Ex. 1; Pltfs. Tr. Ex. 8 at 5; Pltfs. Tr. Ex. 9 at 48:7-49:1.)

17.     Section 9.01 of the Indenture provides for the right to amend the Agreement if the parties see fit. (Pltfs. Tr. Ex. 1 at 54-56.)

18.     The Depository Trust & Clearing Corporation ("DTCC") is the parent company of the Depository Trust Company ("DTC"). DTCC normally holds its notes through Cede & Co.;

however, most parties refer to the noteholder as DTCC or DTC. The nominal owner of the Notes is DTC, while Plaintiffs Rudi Lovati and Alessandra Lovati are two of many beneficial owners.

19.    Plaintiff Rudi Lovati is the owner of $55,400,000 principal amount of Notes (the "Rudi Lovati Notes"), issued pursuant to the Indenture by PDVSA. (Stipulated Facts ¶ 38.) The ISIN for the Rudi Lovati Notes is USP7807HAP03. (*Id*. at ¶ 39.)

20.    Plaintiff Alessandra Lovati is the owner of $55,000.00 principal amount of Notes (the "Alessandra Lovati Notes"), issued pursuant to the Indenture by PDVSA. (*Id*. at ¶ 40.) The ISIN for the Alessandra Lovati Notes is USP7807HAP03. (*Id*. at ¶ 1.)

## II.    PDVSA's Default on Plaintiffs' Notes.

21.    PDVSA is in breach of its contractual obligations to pay principal and interest to Plaintiffs.

22.    Specifically, PDVSA has not made interest payments to beneficial owners due on the Notes since May 2017, and has not made any principal payment on the Notes. (Pltfs. Tr. Ex. 19.)

23.    By letters dated February 8, 2019, Plaintiffs provided written notice to PDVSA and to Wilmington Trust Company, as trustee under the Indenture, advising that PDVSA was in default of its obligation to make interest payments on the Notes, and demanding immediate payment on the outstanding interest obligations. (Pltfs. Tr. Ex. 19.)

24.    Despite the foregoing demands, PDVSA has failed to make any payment of interest or principal on the Notes since May 17, 2017 and claims that it was impossible to do so. (Pltfs. Tr. Ex. 2.)

25.    The total amount of missed principal and interest payments on Plaintiff Rudi Lovati's Notes is $97,781,000.00 and, with accrued pre-judgment interest, PDVSA owes Rudi Lovati $139,740,762.68 as of January 28, 2026. Pre-judgment interest on the missed payments

accrues daily in the amount of $24,110.38, through November 17, 2026, whereupon the amount will increase should PDVSA fail to pay principal in full.

26.    The total amount of missed principal and interest payments on Plaintiff Alessandra Lovati's Notes is $99,550.00 and, with accrued pre-judgment interest, PDVSA owes Alessandra Lovati $141,809.14 as of January 28, 2026. Pre-judgment interest on the missed payments accrues daily in the amount of $24.55, through November 17, 2026, whereupon the amount will increase should PDVSA fail to pay principal in full.

## III.    PDVSA Continued to Make Post-"Impossibility" Payments on Other of its Bonds.

27.    On August 24, 2017, President Trump issued Executive Order 13808 ("EO 13808"). (Stipulated Facts ¶ 62.) EO 13808 prohibits transactions related to bonds issued by the Government of Venezuela. (*Id*. at ¶ 63.) Transactions related to the Notes are nominally prohibited under EO 13808. (*Id*. at ¶ 65.) However, the Office of Foreign Assets Control ("OFAC") issued General License 3 contemporaneously with EO 13808. (*Id*. at ¶ 66.) General License 3 permits payments, under certain conditions, on certain notes that are otherwise prohibited under EO 13808. (*Id*. at ¶ 67.) General License 3 exempts transactions related to the Notes from EO 13808. (*Id*. at ¶¶ 68-69.)

28.    In 2016, PDVSA issued, pursuant to a separate Indenture, 8 ½% Senior Secured Notes due 2020 ("8 ½% Notes" or "2020 Notes"). *PDVSA*, 495 F. Supp. 3d at 261; Pltfs. Tr. Ex. 8 at 17-18. The 8 ½% Notes were collateralized by a 50.1% share in Citgo, which is owned by PDVSA. *PDVSA.*, 495 F. Supp. 3d at 261.

29.    PDVSA made all required payments of principal and interest on its 8 ½% Notes in the latter part of 2017, 2018 and in the early part of 2019. *PDVSA*, 495 F. Supp. 3d at 261. (Stipulated Facts ¶ 95; Pltfs. Tr. Ex. 8 at 17-18.) These payments were made by PDVSA's banks

to DTC's banks and the payments were distributed to the beneficial owners. (Pltfs. Tr. Ex. 8 at 17-18; Pltfs. Tr. Ex. 9 at 79:5-82:17.)

30.    According to PDVSA's expert, the collateralization of the 8 ½% Notes was a "special characteristic" that caused the United States to encourage payment of the 8 ½% Notes according to "media reports" he had read. (Pltfs. Tr. Ex. 4 at 24:22-25:24.) Aside from this hearsay, no evidence has been cited to support the expert's assertion. Nor is there any evidence that the United States discouraged payment on any other PDVSA Notes. Moreover, no evidence has been offered explaining why PDVSA did not apply the same payment approach to the 9% Notes or other Notes, nor why the 8½% Notes were paid while the 9% Notes were not.

31.    In litigation involving the 8 ½% Notes after PDVSA declared them unconstitutional under Venezuelan law, the presiding judge, Judge Failla, asked for and received a Statement of Interest from the Government of the United States. *PDVSA. v. MUFG Union Bank, N.A.*, No. 19-cv-10023 (S.D.N.Y Sep. 16, 2020), ECF No. 213. The Statement of Interest submitted by the United States provided that the United States was interested in the financial stability and certainty of payment with respect to foreign bonds marketed in the United States. *PDVSA*, 495 F. Supp. 3d at 282 ("The United States also has a substantial interest in avoiding the adverse effects that uncertainty in contract enforcement could have on international financial markets and on our efforts to restructure foreign debt."). The United States reaffirmed this position in a subsequent Statement of Interest filed in this same action. *PDVSA v. MUFG Union Bank, N.A.*, No. 19-cv-10023 (S.D.N.Y. Aug. 29, 2025), ECF No. 393.

32.    The payments PDVSA made to DTC in connection with the 8 ½% Notes originated from PDVSA's accounts with Gazprombank in Russia and Novo Banco, S.A. in Lisbon, Portugal. (Stipulated Facts ¶ 96; Pltfs. Tr. Ex. 8 at 17-18; DELTRUST 0000168.) Although Gazprombank

has been subject to OFAC's sectoral sanctions since at least March 27, 2017, that has not prevented PDVSA money transfers to and from GazpromBank. (Stipulated Facts ¶ 97; Pltfs. Tr. Ex. 9, Rice Ex. 9; DELTRUST_0007095.)

33.    PDVSA's $133,380,000 payment on notes maturing in November 2017 (the "2017 Notes") was made via its bank account with the Banco de Desarrollo Economico y Social de Venezuela ("BANDES") in Caracas, Venezuela. (Stipulated Facts ¶ 92; Pltfs. Tr. Ex. 9 at 116:5-117:22; Pltfs. Tr. Ex. 7; DELTRUST_0000356.) That payment was sent to DTCC in full, resulting in payment to beneficial owners of the 2017 Notes. (Pltfs. Tr. Ex. 7.)

34.    PDVSA was able to, on several other occasions, transfer funds to DTCC, the parent of the nominal owner of the bonds, by transmitting funds from a PDVSA bank account to JPMorgan Chase ("JPMC"), which functioned as DTCC's bank. (Pltfs. Tr. Ex. 17; DELTRUST_0000177.)

35.    In consultation with PDVSA and DTCC, the parties all agreed to adapt this method of payment with regard to the 9% Notes. In fact, PDVSA transferred $10,000,000 in funds to DTCC's bank in November 2017. (Pltfs. Tr. Ex. 3 at 11-12.; DELTRUST_0000364.) In the same period subsequent to August 2017, PDVSA made payments on other bonds to DTCC's bank. At least the following transfers were made:

| 2026 | 6% Notes | $9,999,955 |
| 2024 | 6 % Notes | $10,000,000 |
| 2035 | 9.75 % Notes | $10,000,000 |
| Unspecified | | $8,119,982.50 |
| 2022 | 6% Notes | $90,000,000 |
| 2022 | 12.75% Notes | $9,999,955 |

36.    In the foregoing instances, PDVSA did not make complete payments, and as a result, DTCC did not distribute any payment because of DTCC's former policy against partial payments. (Pltfs. Tr. Ex. 9 at 95:13-96:3.) No evidence has been offered explaining why PDVSA chose to make only partial payments on the Notes rather than remit full payment, which DTC would have distributed.

37.    While PDVSA made partial payments on certain other Notes, it made full payment on the 2017 Notes, with $1,342,716.90 in excess of the required payment amount retained by DTCC. (Pltfs. Tr. Ex. 7; DELTRUST_0000357.) There is no evidence as to why PDVSA chose to make full payments on these notes without paying other notes, including the 9% Notes.

**IV.    The Creation of an Alternative Payment Route was Both Permissible and Possible.**

38.    Thomas Musarra was a manager at Law Debenture and a director at Delaware Trust. (Stipulated Facts ¶ 42.) Thomas Musarra was one of the persons responsible for handing Delaware Trust's Principal Paying Agent role under the Indenture. (*Id.* at ¶ 43.)

39.    Prior to June 2017, Delaware Trust performed its Principal Paying Agent function under the Indenture via its bank, PNC Bank, N.A. ("PNC"). (*Id.* at ¶ 44.)

40.    On June 29, 2017, PNC informed Delaware Trust that, "effective immediately, . . . the Bank will no longer process any transactions involving Petroleos de Venezuela, S.A. (a/k/a PDVSA) and its corporate family." (*Id.* at ¶ 72.) Delaware Trust worked to locate a bank that it could use in place of PNC that would accept payments from PDVSA on the Notes. (*Id.* at ¶ 76.) PDVSA attempted to leverage Citgo's banking relationships to find a replacement bank for Delaware Trust. (*Id.* at ¶ 80.) However, there is no evidence that Citgo ever offered help – or was ever asked to help –find an alternative bank for the Paying Agent.

41.    On August 2, 2017, Delaware Trust submitted its contingent resignation as Principal Paying Agent under the Indenture. (Stipulated Facts ¶ 85.) In its resignation letter,

Delaware Trust stated that it would continue to act as Principal Paying Agent until a replacement was found. (*Id*. at ¶ 88.) Delaware Trust continued to work with PDVSA until a successor principal paying agent could be located. (*Id*. at ¶ 90.)

42.     Delaware Trust contacted a number of banks to inquire about opening an account to facilitate payments under the Notes. (*Id*. at ¶¶ 76-78.) Of the banks Delaware Trust contacted, Italbank and Banco de San Juan were willing to open an account. (Pltfs. Tr. Ex. 8 at 6; DELTRUST_0000178; DELTRUST 0003758-0003759.)

43.     PDVSA and Delaware Trust ultimately did not pursue the alternative payment option involving the opening of an account with Italbank despite confirmation that (i) Italbank was willing to open an account to facilitate PDVSA's debt payments, and (ii) DTCC was willing and able to receive payments from Italbank through JPMC, which was processing payments related to various PDVSA notes for which Delaware Trust served as paying agent. (Pltfs. Tr. Ex. 8 at 18.)

44.     PDVSA and Delaware Trust abandoned this particular effort upon determining that Italbank would not be able to open the account in time to process an interest payment due in August 2017 on a separate PDVSA issuance. (Pltfs. Tr. Ex. 8 at 12; DELTRUST 0000219.) However, the second 2017 interest payment under the 9% Notes was not due until November 17, 2017—three months later. PDVSA presented no evidence that it took any steps to establish the Italbank account for the purpose of the November 2017 payment.

45.     JPMC declined to open an account for Delaware Trust, as Principal Paying Agent, to process payments from PDVSA under the Notes. (Stipulated Facts ¶ 100.) No reason for that declination is provided in the proffered evidence. As mentioned above, JPMC did accept payments for DTC.

46.     Another payment alternative discussed by PDVSA, Delaware Trust, and DTCC was for PDVSA to make direct payments to DTCC by wire. (Pltfs. Tr. Ex. 8 at 19.)

47.     On November 12, 2017, DTCC received a direct payment of approximately $8 million from PDVSA (the "November 12, 2017 Payment"). (Pltfs. Tr. Ex. 8 at 8; DELTRUST_0000360-DELTRUST_0000361.) However, it was unclear to DTCC how PDVSA wanted the funds to be allocated. (DELTRUST_0000356; DELTRUST_0000360-DELTRUST_0000361.) As such, DTCC held the funds and inquired with PDVSA as to how the funds should be applied. (*Id.*) There is no evidence that PDVSA responded to those inquiries.

48.     On or about December 19, 2017, DTCC received several wires totaling approximately $40 million, which represented partial payments for various PDVSA issuances, including one partial payment of $10 million allocated to the Notes, which was less than the amount due on the November 17, 2017 Interest Payment (the "December 19, 2017 Partial Payments") (Pltfs. Tr. Ex. 5; PDVSA000026.) At the time, DTCC had a policy of not paying partial allocations and thus DTCC would not distribute the $10 million to beneficial holders of the Notes but no evidence has been presenting explaining why it did not make full payment of the amounts then due. (*See* Pltfs. Tr. Ex. 9 at 95:13-96:3.) Following the December 19, 2017 Partial Payments, it does not appear that PDVSA made further direct payments to DTCC under the Notes.

49.     Jean-Paul Duvivier, PDVSA's expert, stated that the transmission solution arrived at by the parties (i.e., payments directly from PDVSA's bank to DTCC's bank) was "creative, even exceptional." (Pltfs. Tr. Ex. 3 at 11; Pltfs. Tr. Ex. 4 at 59:7-60:4.)

50.     Stephanie Rice, Plaintiffs' expert, testified that parties were not absolutely bound by the payment terms contained in the Notes and that such alternatives methods were employed with great frequency. (Pltfs. Tr. Ex. 1; Pltfs. Tr. Ex. 8 at 5; Pltfs. Tr. Ex. 8 at 48:7-49:1.)

51.     Stephanie Rice was the Director and Head of U.S. Compliance for Bank of Tokyo Mitsubishi UFJ, Ltd. ("Bank of Tokyo") from January 2017 until May 2018. (Pltfs. Tr. Ex. 8 at 2, 21.)

52.     Between August 2017 and May 2018, Stephanie Rice approved many receipts by Bank of Tokyo of PDVSA funds from PDVSA bank accounts. (Pltfs. Tr. Ex. 9 at 37:2-21.) In each instance in which approval was required, other banks had approved the transfer of PDVSA funds before the funds reached Bank of Tokyo. (*See* Pltfs. Tr. Ex. 8 at 17-18.)

53.     Stephanie Rice is aware of members of other banking institutions who "were regularly processing payments involving PDVSA . . ." in 2017 and 2018. (Pltfs. Tr. Ex. 8 at 17.)

54.     Although banks must comply with the United States' sanctions policies, internal bank policies vary among different banks and, further, often change over time. (Stipulated Facts ¶ 46.) Each bank's risk appetite can, and often does, vary significantly from bank to bank as well as in different business units of the same bank. (*Id*. at ¶ 51.) In this case, payments from PDVSA were permitted by law no matter how they were accomplished. (*Id*. at ¶ 69.)

55.     As noted previously, the 8 ½% Notes continued to be paid while payments were stopped on the 9% Notes.  Yet, no evidence was proffered explaining why PDVSA was able to make payments on these 8 ½% Notes when it did not make payments on the 9% Notes at issue here.

56.     There is no evidence that PDVSA ever offered an indemnification to any bank to be the bank for the Principal Paying Agent.

## CONCLUSIONS OF LAW

**V.     Plaintiffs Have Established a Prima Facie Case of PDVSA's Breach of the Notes**

57.     New York law is a freedom of contract state, and its authorities hold that "a bond is a contract." *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 257–58 (2d Cir. 2012) (citing

*Arch Ins. Co. v. Precision Stone, Inc*., 584 F.3d 33, 39 n.4 (2d Cir. 2009)); s*ee also MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 517 (S.D.N.Y. 2017) ("A bond is, of course, a contract, and the obligations and rights of the parties are thus defined by the terms of the bond."), *aff'd*, 719 F. App'x 47 (2d Cir. 2017). As such, a claim for a breach of sovereign note obligations turns on a "simple question of contract interpretation." *NML Cap., Ltd.*, 699 F.3d at 258 (citing *EM Ltd. v. Republic of Argentina*, 382 F.3d 291, 292 (2d Cir. 2004)).

58.    To prevail on their breach-of-contract claim, Plaintiffs must prove "(i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach." *Mun. Cap. Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 390 (S.D.N.Y. 2002); *see also Dvoskin v. Prinz*, 205 A.D.2d 661, 661, 613 N.Y.S.2d 654, 655 (2d Dep't 1994) ("A party establishes her *prima facie* entitlement to judgment on promissory notes as a matter of law by producing the promissory notes executed by the defendant and by establishing the defendant's default thereon.").

59.    As the Court previously found in its order denying the parties' cross-motions for summary judgment, it is undisputed that Plaintiffs have proven each element to support their breach of contract claim against PDVSA. (D.E. 155 at 7.) In particular, Plaintiffs own Notes in the amount of $55,455,000 and PDVSA has failed to make contractually-required principal and interest payments on the Notes, resulting in damage to Plaintiffs in the amount of the missed principal and interest payments.

## VI.    PDVSA's Breach of the Notes Is Not Excused By the Impossibility Doctrine.

60.    Rather than dispute having breached its Note payment obligations, PDVSA seeks to excuse its breach on the grounds that payment was impossible. As this Court previously found, to invoke the impossibility doctrine, PDVSA bears the burden of proving "that its performance was 'objectively impossible.'" (D.E. 155 at 9 (citing *Dresser-Rand Co. v. Petroleós de Venezuela,*

*S.A.*, 574 F. Supp. 3d 217, 223 (S.D.N.Y. 2021), *aff'd sub nom. Siemens Energy, Inc. v. Petroleós de Venezuela, S.A.*, 82 F.4th 144 (2d Cir. 2023)). PDVSA cannot meet its burden for several reasons.

### A. Impossibility Doctrine Available Only for Executory Contracts.

61.     Under New York law, the impossibility defense "only goes so far as to excuse the performance of an executory contract. It has never been held available for the purpose of unjustly enriching one party at the expense of the other." *Sokoloff v. National City Bank of New York*, 208 A.D. 627, 630, 204 N.Y.S. 69, 71 (1st Dep't 1924), *aff'd*, 239 N.Y. 158 (1924); *see also Moreno-Godoy v. Kartagener*, 7 F.4th 78, 89 (2d Cir. 2021) (impossibility doctrine "could not relieve" attorney from obligation to repay money received).

62.     The Notes are not an executory contract because there is no performance required by Plaintiffs before they are entitled to payment of principal and interest on the Notes. *See, e.g.*, *ReGen Capital I, Inc. v. Halperin* (*In re U.S. Wireless Data, Inc.*), 547 F.3d 484, 488 n.1 (2d Cir. 2008) (defining "executory contract" as one in which obligations of both respective parties "to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other"); *FDIC v. Malin*, 802 F.2d 12, 17 (2d Cir. 1986) ("An executory contract, on the other hand, is one in which the promisee's rights do not immediately come into existence but are conditioned upon some further performance, usually by the promisee."). It follows that impossibility is not available as a payment defense on the Notes.

63.     Indeed, it would be entirely inequitable to permit PDVSA – having sold Notes on the open market in the value of $2,394,239,600 – to retain the benefits of its Note offering while withholding the required principal and interest payments that were a central consideration for the Notes simply because it faced challenges making the interest payments some eight years ago. Such an outcome would result in an unconscionable windfall without precedent in New York history.

13

The impossibility doctrine simply does not permit PDVSA to reap the benefits of a $2 billion bond offering without having to pay on the Notes. *See, e.g.*, *Santander Bank, N.A v. Am. Best Getaways Inc.,* No. 714168/18, 2019 WL 3531915, at *2 (N.Y. Sup. Queens Cty. June 12, 2019) ("To allow avoidance of the debt in this case would serve to unjustly enrich the defendants at the expense of the plaintiff.").

### B.    PDVSA Cannot Prove Its Note Payments Were Impossible.

64.    Even if impossibility permitted borrowers to walk away from their repayment obligations, PDVSA should not be excused here. New York courts construe the impossibility defense narrowly, in part due to "judicial recognition that the purpose of contract law is to allocate the risks that might affect performance." *Clarex Ltd. v. Natixis Sec. Americas LLC*, 988 F. Supp. 2d 381, 392 (S.D.N.Y. 2013) (quoting *Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902, 524 N.Y.S.2d 384, 385 (1987)) (internal quotation marks omitted).

65.    "Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." *Kel Kim*, 70 N.Y.2d at 902, 524 N.Y.S.2d at 385. "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Id*.

66.    The impossibility defense is available to a party whose performance "is made impracticable without [the party's] fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981). But "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 344 (1968).

67.    To establish the defense of impossibility in this case, PDVSA must therefore show "that it took virtually every action within its power to perform its duties under the contract," *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990), and that, despite those efforts, performance was "objectively impossible," *Kel Kim*, 70 N.Y.2d at 902, 524 N.Y.S.2d at 385.

68.    "Difficulty or improbability of accomplishing the stipulated undertaking" is not enough to make out an affirmative defense of impossibility. *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 159 (2d Cir. 2023) (citing *Cameron-Hawn Realty Co. v. City of Albany*, 207 N.Y. 377, 101 N.E. 162, 163 (1913)). Rather, "[i]t must be shown that the thing cannot *by any means* be effected," *id.* (emphasis added), and "[n]othing short of this will excuse nonperformance," *id.*; *see also* Restatement (Second) of Contracts § 264 cmt. a, illus. 4 (requiring that a party seeking to excuse its nonperformance because of legal impossibility nonetheless show "diligent efforts" to perform); *id.* § 261 cmt. d, illus. 11 (establishing that performance is not impracticable if a party, "in breach of his duty of good faith and fair dealing ... makes no effort to obtain a variance" from the legal obstacle, if there is reason to believe such action could make performance possible); *Krulewitch v. Nat'l Importing & Trading Co.*, 195 A.D. 544, 186 N.Y.S. 838, 840 (1921) (World War I embargos did not excuse failure to perform duties under shipping contract where obligor could have shipped the goods to another port).

69.    PDVSA cannot meet its burden. The record conclusively demonstrates that PDVSA continued to make payments to DTCC after the promulgation of E.O. 13808, including payments on the 8 ½% Notes, payment on the 2017 Notes, and partial payments on a number of other Notes, including the 9% Notes at issue here. (Pltfs. Tr. Ex. 4 at 56:7-19; PDVSA000026; DELTRUST_0003705-DELTRUST_0003706.) For example, in November 2017, after E.O. 13808 had taken effect, PDVSA transmitted $133,380,000 to DTCC, an amount sufficient to pay

in full a set of notes with principal and interest then due, leaving an excess balance of $1,342,716.90. (DELTRUST_0000357.) PDVSA has never explained how it was able to make that payment, but the explanation is self-evident: payment was not impossible.

70.     At the time E.O. 13808 was promulgated, Delaware Trust served as Paying Agent. Its former employee testified that PNC Bank refused to process PDVSA-related payments, and that Delaware Trust was unable to find an alternative bank willing to accept PDVSA funds for onward transmission to JPMC, DTCC's bank.

71.     Critically, however, that same witness testified that PDVSA, Delaware Trust, and DTCC resolved this issue by agreeing to bypass the Paying Agent's bank entirely and transfer funds directly from PDVSA's banks to DTCC's JPMC account. As a result, millions of dollars were in fact transferred from PDVSA to DTCC after E.O. 13808, with such transfers continuing until at least 2019. This evidence is fatal to PDVSA's impossibility defense. Where PDVSA demonstrably found, and used, a mechanism to make payments, it cannot plausibly claim that performance was "objectively impossible."

72.     The evidence further demonstrates that other banks were processing transfers to and from PDVSA throughout the relevant period. Stephanie Rice, as Director and Head of U.S. Sanctions Compliance at Bank of Tokyo, was responsible for approving or rejecting transactions involving PDVSA funds that passed through Bank of Tokyo as an intermediary during the relevant time period. She testified that there were approximately 10 to 30 such transactions per week and that a number of those transactions were approved. (Pltfs. Tr. Ex. 9 at 37:2-21.)

73.     Ms. Rice further testified that she personally approved the receipt of transfers from PDVSA accounts, and that Bank of Tokyo also received PDVSA funds from other institutions and transmitted PDVSA funds onward to additional banks. She also testified that that PDVSA funds

transferred to Bank of Tokyo had to be approved by the transferring bank. Her affidavit further confirms that she was aware of other banks that "were regularly processing payments involving PDVSA that were permitted by E.O. 13808." This testimony alone conclusively refutes PDVSA's claim of impossibility as transfers involving PDVSA funds were, in fact, occurring regularly during the very period PDVSA claims performance was "impossible."

      **C.**    **At Most, PDVSA Has Proven Only A Single Note Payment Was Impossible.**

74.    PDVSA has indisputably failed to make a single required payment of interest or principal on the Notes to beneficial owners since May 2017. The Notes required payments every six months until the Notes were paid in full, but PDVSA completely stopped making payments to beneficial owners in 2017.

75.    All of the evidence PDVSA has proffered to the Court is limited to its purported efforts surrounding a single missed interest payment in late 2017. There is no evidence whatsoever regarding PDVSA's recurring and uncured payment failures after that missed 2017 interest payment, including the principal payments that became due and owing upon the Notes' maturity. PDVSA, in short, has failed to show that any of its other missed payments were impossible to make. Absent any such evidence, this Court cannot find impossibility excuses those other missed Note payments

76.    This conclusion is supported by the doctrine of partial impossibility, about which the Restatement of Contracts 463 states:

> Where impossibility of performing part of the performance promised by a party to a bargain is of such character that if it related to the entire performance it would prevent the imposition of a duty or would discharge a duty that had arisen, and the remainder of the performance is not made materially more difficult or disadvantageous than it would have been if there had been no impossibility, the existence of duty is affected only as to that part; and if performance of the whole contract is possible with only an

> unsubstantial variation, the promisor is under a duty to render performance with that variation.

Or, as summarized by the Court of Claims as to New York law:

> In the eyes of the law being a part of the terms of the contract, the conditions that rendered performance impossible do not terminate the contract ab initio, and vitiate what has been done and what remains to be done that is capable of execution. The conditions may . . . excuse performance only to the extent to which performance is impossible, and leave what has been done valid permitting a recovery therefor, and may not excuse performance of the remaining work.

*Kinzer Const. Co. v. State*, 125 N.Y.S. 46, 55 (Ct. Cl. 1910), *aff'd,* 145 A.D. 41, 129 N.Y.S. 567 (3d Dep't 1911), *aff'd,* 204 N.Y. 381 (1912).

77.     The impossibility doctrine will not excuse those obligations which are not impossible. *See, e.g.*, *In re Food Mgmt. Grp., LLC*, 372 B.R. 171, 209 (Bankr. S.D.N.Y. 2007) ("the doctrine of Partial Impossibility would still require Matrix to perform on those stores where performance was not allegedly frustrated"); *Miller v. Vanderlip*, 285 N.Y. 116, 124, 33 N.E.2d 51, 55 (1941) ("Thus if for a valid consideration 'A' makes two promises to 'B,' and one of the two promises calls for an impossible reformance, there is no reason why 'A' should not be called upon to perform in so far as he is able to do so."); *Int'l Paper Co. v. Rockefeller*, 161 A.D. 180, 185, 146 N.Y.S. 371, 375 (3d Dep't 1914) (though fire excused performance regarding burned wood, "defendant [was] not excused from delivering the live spruce suitable for pulp wood which survived the fire").

78.     Whatever may be said about hindrances to PDVSA's ability to fully satisfy its semi-annual interest payment obligations in November 2017, there is no evidence that these hindrances impacted any future interest or principal payment obligations on the Notes in 2018 or at any point thereafter.

18

79.     At best, PDVSA is excused only from making its semi-annual interest payment on November 17, 2017. There is absolutely no evidence whatsoever in the record to support the application of the impossibility defense to any subsequent payments that were due and owing under the Notes. PDVSA therefore is in breach of its ongoing and uncured obligations to pay principal and interest on the Notes running from November 2017 to the present and it has not established any defense excusing its ongoing and uncured breaches.

## VII.    PDVSA Must Make Plaintiffs Whole and Rescind the Notes to Invoke Impossibility.

80.     Whether performance was rendered partially or fully impossible, equity does not permit PDVSA to reap a windfall. It issued more than $2 billion in the 9% Notes and it reaped the benefit of that issuance. Its inability to timely pay Plaintiffs does not and cannot mean Plaintiffs are not entitlement to payment at all. PDVSA still must make Plaintiffs whole.

81.     "The remedy for impossibility, or its related and more applicable principle, frustration of purpose, is rescission of the contract." *Brittain v. Trust of Columbia Univ. in the City of New York*, No. 20-CV-9194 (PKC), 2021 WL 3539664 (S.D.N.Y. Aug. 11, 2021); *see also United States v. General Douglas McArthur Senior Village, Inc*., 508 F.2d 377, 381 (2d Cir. 1974) ("discharge by reason of impossibility—as well as the concomitant remedy (to the discharge) of rescission—enforces what can reasonably be inferred to be the intent of the parties at the time of contract."). As the First Department long ago observed: "The utmost that the defendant can urge is that it be relieved from the performance of its agreement, in so far as the agreement has been rendered impossible of performance; but on no principle can it be urged that the defendant became relieved from the obligation of repayment of the amount received, when through no fault on the part of the plaintiff it was unable to complete the contract." *Sokoloff*, 208 A.D. at 630, 204 N.Y.S. at 71.

82.     Applying these common-sense equitable principles, New York courts finding impossibility to be a viable defense direct the defendant to make the plaintiff whole. *See, e.g., Univ. of Minnesota v. Agbo*, 176 Misc.2d 95, 96, 673 N.Y.S.2d 812, 813 (2d Dep't App. Term 1998) ("Defendant here is not seeking to excuse himself from further performance of the contract, but from payment of a debt. Under these circumstances plaintiff is entitled to restitution for its performance."); *Leisure Time Travel, Inc. v. Villa Roma Resort & Conf. Ctr., Inc.*, 55 Misc. 3d 780, 782, 52 N.Y.S.3d 621, 623 (N.Y. Sup. Queens Cty. 2017) (defendant invoking impossibility must refund deposit).

83.     Here, too, in order to avoid unjust enrichment, PDVSA must return to Plaintiffs the full amount of its rescinded payment obligations – whether a single interest payment or the entire principal balance of the Notes – as well as all interest that has accrued on that money since 2017.

84.     The award of pre-judgment interest is necessary to avoid unjust enrichment. Pursuant to CPLR § 5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."

85.     A recent intermediate state appellate decision is instructive. *Bistro Shop LLC v. N.Y. Park N. Salem*, 175 A.D.3d 1181, 109 N.Y.S.3d 277 (1st Dep't 2019). The Appellate Division in that case affirmed an order that rescinded a lease and directed the defendant to reimburse the plaintiff interest running from the date that the defendant deprived the plaintiff of its funds. *Id.*, 175 A.D.3d at 1182, 109 N.Y.S.3d at 279 ("The evidence clearly shows that in March 2008, the tenant stopped making monetary investments into the property as the owner did not appear to be complying with the lease. As such, tenant was deprived of the time value of the money spent in furtherance of construction of its restaurant from March 31, 2008 onward").

86.    Like the *Bistro Shop* plaintiff, Plaintiffs here have been deprived of the use of any funds to which they were contractually entitled under the Notes since 2017. If PDVSA wishes to rescind its obligations effective 2017, it must pay Plaintiff's the amounts to which Plaintiff would have been entitled in 2017, plus interest to account for the loss of funds in the meantime. Such an award of interest ensures that Plaintiffs "will be made whole and encourages" parties seeking rescission to do so in a timely manner. *Mohassel v. Fenwick*, 5 N.Y.3d 44, 51, 799 N.Y.S.2d 758, 762 (2005).

87.    The award of 9% in statutory interest on the rescinded payments is appropriate because it aligns with the contractual interest payable under the Notes and therefore restores Plaintiffs to their 2017 position while preventing PDVSA from reaping a windfall. *See, e.g.*, *Residential Fences Corp. v. Rhino Blades Inc.*, No. 14-CV-2552 (SIL), 2024 WL 964681, at *8 (E.D.N.Y. Mar. 6, 2024), *aff'd*, No. 24-897-CV, 2025 WL 583323 (2d Cir. Feb. 24, 2025) (awarding statutory rate on unjust enrichment claim); *Ogletree, Deakins, Nash, Smoak & Stewart P.C. v. Albany Steel Inc.*, 243 A.D.2d 877, 879-80, 663 N.Y.S.2d 313, 315 (3d Dept. 1997) (awarding statutory rate on quantum meruit claim); *cf. Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991) (for "equitable claims for breach of duty and unjust enrichment," the Second Circuit has long held "that the equity clause should not become a source of sterile controversy over the classification of causes of action").

88.    Moreover, the equities support the award of interest because PDVSA's litigation history has long deprived Plaintiffs of their benefits under the Notes. Plaintiffs filed this lawsuit almost six years ago on May 23, 2019. (D.E. 1.) PDVSA responded, not by invoking impossibility, but by filing a motion to dismiss and asking the Court to stay proceedings on August 28, 2019. (D.E. 13.) After this Court denied that motion for failing to comply with the Court's rules (D.E.

21), PDVSA filed a second motion to dismiss or stay the proceedings. (D.E. 24.) While its supporting papers relied on the political uncertainty in Venezuela, PDVSA never invoked the impossibility doctrine, let alone by offering to rescind the Notes. (D.E. 25.)

89.    PDVSA's delay tactics worked. It was not until October 23, 2020 – seventeen months into the litigation – that PDVSA first asserted a boiler-plate defense of impossibility. (D.E. 42.) But rather than offer to rescind the Notes to make Plaintiffs whole, PDVSA engaged in still further delay tactics, filing yet a third Rule 12 motion, seeking judgment on the pleadings, which this Court denied on December 14, 2021. (D.E. 49 & 68.)

90.    Only in February 2022 – almost three years after the lawsuit commenced – did PDVSA begin to take discovery to support its impossibility defense. (D.E. 80.) Even then, PDVSA did not offer to rescind or to otherwise make Plaintiffs whole. Indeed, it still has not done so. Rather PDVSA has continued to litigate the viability of its impossibility defense, dragging out this litigation for years, all the while depriving Plaintiffs of their benefit of the bargain.

91.    To be sure, Plaintiffs are not responsible for the conditions that underlie PDVSA's impossibility defense. They have merely bore the brunt of PDVSA's scorched-earth litigation tactics which have deprived Plaintiffs of the fruit of their contract even as PDVSA reaped all the benefits of the contract. In these circumstances it would not be fair or just to deprive Plaintiffs the benefit of interest that has accrued on the funds that it has been deprived for almost nine years.

92.    The Court therefore finds that PDVSA may invoke the impossibility doctrine only to the extent that it rescinds the obligations rendered impossible, and pays Plaintiffs the entire amount of such missed payment obligations plus interest in the amount of 9% that has accrued since the time of PDVSA's missed payments.

Dated: New York, New York
       January 7, 2026

                                    DUANE MORRIS LLP

                                    By:  __/s/ Anthony J. Costantini_____
                                         Anthony J. Costantini
                                         Rudolph J. DiMassa, Jr.
                                         David T. McTaggart
                                         Stephanie Lamerce
                                         Jillian Dreusike

                                    22 Vanderbilt
                                    335 Madison Avenue, 23rd Floor
                                    New York, New York 10017
                                    Phone: (212) 692-1000
                                    Email: ajcostantini@duanemorris.com
                                          diMassa@duanemorris.com
                                          dtmctaggart@duanemorris.com
                                          slamerce@duanemorris.com
                                          jdreusike@duanemorris.com

                                    *Attorneys for Plaintiffs*

DM3\22179432.13